# Chincleclamouche Lumber and Boom Company *versus* The Commonwealth *ex rel.* Attorney-General.

1. The first section of article XVI. of the Constitution of 1874, declaring the repeal of all charters under which a bona fide organization had not taken place and business been begun, is a valid exercise of constitutional power, and is not in conflict with the provision of the Federal Constitution which declares that no state shall pass any law impairing the obligation of contracts.

2. When it is expressed in the act of incorporation itself, or in a general statute in force at the time of the grant, or in the organic law of the state, that the legislature shall have power to revoke or annul a charter, such provision becomes a condition of the grant and one of the terms of the contract.

3. Where a charter of incorporation is granted by the state, there is an implied contract, on the part of the grantees, that they will perform the duties and exercise the privileges conferred by the charter; and where no time is stipulated, the grantees should perform, on their part, within a reasonable time, or else the charter may be declared forfeited by Act of legislature, constitutional enactment, or quo warranto.

4. A charter was granted by special act of the legislature in 1867, and the grantees accepted it, paid the enrollment tax, opened books and

[Chincleclamouche Lumber and Boom Company *v*. The Commonwealth.]

received subscriptions for about one-half the capital stock, but did nothing further until 1882, when they proceeded to organize and carry out the purposes of their incorporation. Upon quo warranto by the Commonwealth to test their right to proceed under said charter,—*Held*, that the charter was granted by the Commonwealth subject to the right of the legislature to annul it when in their opinion it became injurious to the citizens; that a revocation by the state Constitution had the same effect as an act of the legislature; and that said charter was revoked by art. XVI., § 1, of the Constitution of 1874.

5. The second section of the schedule of the Constitution of 1874, which continues in force all private laws not inconsistent with the Constitution, saves rights and contracts; not charters and grants of special and exclusive privileges.

May.2d 1882. Before Sharswood, C. J., Mercur, Gordon, Paxson, Trunkey, Sterrett and Green, JJ.

Error to the Court of Common Pleas of *Clearfield county :* Of January Term 1882, No. 432.

Quo warranto, by the Commonwealth of Pennsylvania, at the relation of Henry W. Palmer, Attorney-General, by request of the owners of certain timber lands situate in Clearfield county, directed to the Chincleclamouche Lumber and Boom Company, and George W. Hoover, president, D. L. Krebs, secretary of said company, to test the right of said company to construct booms and dams on the west branch of the Susquehanna river, and Clearfield creek at, or near the town of Clearfield.

The facts as set forth in the suggestion and answer were as follows : The Chinclechamouche Lumber & Boom Company was incorporated by a special Act of Assembly passed January 7th 1867 (P. L. 1541), which authorized it, inter alia, to erect booms on the west branch of the Susquehanna river and in Clearfield creek, at any points within twelve miles of the mouth of said creek, and to enjoy other privileges necessary to carry out the purposes of the corporation. It was required to pay a bonus to the State of one-half of one per cent. on the capital stock, and such taxes as might be determined by law. On February 27th 1867, the company paid to the Commonwealth $210, the lawful enrollment tax. On April 15th 1867, the Legislature passed another Act, entitled "An Act to give the Chincleclamouche Lumber & Boom Company the right to sue for toll and boomage;" and on October 25th of the same year, the corporators met, opened the subscription books and received subscriptions for more than one-half of the capital stock. Nothing further was done by the company under its charter until 1882, in which year on January 21st a board of directors was chosen, and on the 24th of the same month $500, the bonus on the capital stock, was paid to the Commonwealth.

[Chincleclamouche Lumber and Boom Company *v*. The Commonwealth.]

The relator averred, that under the Act of January 7th 1867, the corporators named therein, were about to enter upon the west branch of the Susquehanna river, and upon Clearfield creek, and erect dams and booms in furtherance of the purposes of the company, which was claimed to exist under said Act; that various persons owning timber lands along said streams, above the points at which the defendants were about to erect dams and booms, would thereby be hindered in floating their logs down the stream to the Lock Haven and Williamsport booms.

· The relator charged, that the defendants had no legal right to erect any such booms or dams under said Act of Assembly, and that the said statute conferred no right now, to do so, because, inter alia, no bona fide organization had taken place, nor business been commenced in good faith, by said company under said Act, before the adoption of the Constitution of 1874. article XVI., § 1, of which provides that "All existing charters or grants of special or exclusive privileges, under which a bona fide organization shall not have taken place, and business been commenced in good faith at the time of the adoption of this constitution, shall thereafter have no validity."

The relator therefore prayed for a writ of quo warranto requiring the defendant to show by what authority they exercise corporate privileges under said Act, and why the rights and privileges should not he declared null and void.

In their plea and answer, the respondents averred : that the owners of timber lands above the proposed dams and booms would not be delayed in floating logs below them any longer than was necessary to pass them through the works of the defendant corporation, and that such reasonable delay was indispensable to the enjoyment of the franchises granted to said company by their charter ; that the Act of 1867 was a contract between the corporators and the state of Pennsylvania, within the protection of the first clause of section 10, art. 1 of the constitution of the United States forbidding a state to pass any law impairing the obligation of contracts. Further, that the provisions of the 4th constitutional amendment of 1857 entered into and were a part of said statute and charter of 1867, by reason whereof the Legislature alone had power to "alter, revoke or annul a charter of incoporation," and that the legislature had not so annulled said charter ; and finally, that the said charter contained an executed grant to its stockholders, and that its provisions, with the money paid under them, made a contract with the state, and between the stockholders, which was not destroyed by section 1 of the Constitution of 1874, but which was saved in full force by the second section of the schedule of the same instrument, which continued in force all laws not inconsistent with the Constitution.

[Chincleclamouche Lumber and Boom Company *v.* The Commonwealth.]

The plaintiffs demurred to this plea and answer, and upon argument before ORVIS, J., the court sustained the demurrer, and entered a decree declaring that the company had now no legal right to erect booms or dams under the said act recited in the plea; and gave judgment " that the said corporate defendant and its officers be ousted, and altogether excluded " from all the privileges conferred by said charter and that " its officers be enjoined from entering upon the stream, named in said statute."

Whereupon the company took this writ, assigning for error the decree of the court.

*William A. Wallace,* for plaintiffs in error.—This charter was accepted, the tax paid and a meeting of corporators held, who proceeded to call in the stock. It is a grant of franchises for private purposes, outside of the police power, within the meaning of section 10, art. 1 of the Federal Constitution forbidding a state to pass any law impairing the obligation of contracts: 2 Story on Constitution, 254, 255 ; Dartmouth *v.* Woodward, 4 Wheaton 518; Cooley on Constitutional Limitations * 279, and cases there cited ; Stone *v.* Mississippi, 11 Otto 816 ; The Binghamton Bridge, 3 Wall. 51 ; Home of the Friendless *v.* Rouse, 8 Wall. 430 ; Commonwealth *v.* Pittsburgh and Connellsville Railroad, 8 P. F. Smith 26 ; Brown *v.* Hummel, 6 Barr 86 ; Commonwealth *v.* Cullen, 1 Harris 140 ; Iron City Bank *v.* Pittsburgh, 1 Wr. 340 ; State Bank *v.* Knoop, 16 Howard 369.

This applies to a provision of a state constitution : Gunn *v.* Barry, 15 Wall. 610 ; Dodge *v.* Woolsey, 18 Howard 331 ; Delmas *v.* Ins. Co., 14 Wall. 661; White *v.* Hart, 13 Wall. 646; University *v.* People, 9 Otto, 309 ; Lehigh Valley R. R. Co. *v.* McFarlan, 31 N. J. Eq. 706.

The Constitution of 1874, art. 16, § 1, not only impairs, but destroys the obligation of this contract. The 4th amendment of the state constitution of 1857, which provides that the Legislature shall have power to revoke charters of incorporation, in such manner that no injustice shall be done to the corporators, formed a part of this charter granted in 1867. The constitutional convention of 1874, therefore, in framing the Constitution, and the people in ratifying the same, had no power to revoke it, this could only be done by the legislature. Besides the 2nd section of the schedule to the new constitution saved all charters situated as this one is, by continuing in force all laws not inconsistent with the Constitution.

*Henry W. Palmer* (with whom was *Frank Fielding* and *Robert Snodgrass*), for defendant in error.—The charter comes within § 1, art. XVI., of the Constitution of 1874. It was not.

an existing contract with the state when the said constitution was adopted; because the corporators had not acted up to the end or design for which they were incorporated, within a reasonable time, and had thus failed to execute their part of the contract: Angell and Ames, § 774; Lehigh Bridge Company *v.* Lehigh Coal Company, 4 Rawle 9; Commonwealth *v.* Commercial Bank, 28 Pa. St. 383; Addison on Contracts 320

Non-user, neglect or abuse of franchises is an ancient and undoubted cause for forfeiting a charter, of which the Constitution of 1874 is merely declaratory: State *v.* Vincennes University, 5 Ind. 77; Terrett *v.* Taylor, 9 Cranch 43; Commonwealth *v.* Insurance Company, 5 Mass. 230; Mumma *v.* Potomac Company, 8 Peters 281; Enfield Toll Bridge Company *v.* Connecticut River Company, 7 Conn. 45.

It is not claimed that the non-user ipso facto dissolved the corporation, but that it is a cause of forfeiture which the state may take advantage of; and the failure of the corporators for fifteen years to organize and commence business, is a sufficient cause to warrant a judgment of ouster against them.

If the effect claimed be given to the schedule of the Constitution of 1874, then section 1, article 16, is entirely annulled and destroyed.

Mr. Justice TRUNKEY delivered the opinion of the Court, October 2d 1882.

By the Act of January 7th 1867, P. L. 1541, seven persons were created a corporation by name of the Chincleclamouche Lumber and Boom Company. Among the grants was the right to erect booms in the west branch of the Susquehanna river, or in the Clearfield creek, or in both, at any points within twelve miles of the mouth of said creek, and to have all the rights, privileges and immunities then enjoyed by the Susquehanna Boom Company. The charter of that company authorized the erection and maintenance of such booms, piers, side, branch and shear booms, as may be necessary for stopping logs and other lumber, floating upon the river; the same to be so constructed as to admit safe passage of rafts and boats, and not impede the navigation. It was the duty of the company to raft all lumber in said booms, the owners to pay the expenses of rafting and securing such lumber. Upon the lumber boomed, rafted and secured, the corporation had a lien for the tolls and expenses; also the right to deliver the lumber to the owners, and collect said tolls and expenses as other debts for like amounts are collectible.

The capital stock of this corporation was fixed at one hundred thousand dollars, divided into shares of fifty dollars each, with

privilege to increase the same from time to time to an amount not exceeding three hundred thousand dollars. It was required to pay to the Commonwealth a bonus of one-half of one per centum on its capital stock, and such taxes as are or may be provided by law.

On the 15th day of April 1867 an Act was passed, entitled, "An Act to give the Chincleclamouche and other boom companies the right to sue for tolls and boomage."

The relator suggests that the corporators named in said statute or charter, are about to enter upon and into the west branch of the Susquehanna river and Clearfield creek to erect dams and booms, and do other acts under the statute; that various persons will thereby be hindered in the floating of their logs and timber to points lower down, and that great public injury will accrue; and charges: "That the said corporate defendant has no legal right or authority to erect any such booms or dams under said Act of Assembly as is by it contemplated, and that said statute confers no right now to proceed to do the same, for the reason, inter alia, that no bona fide organization had taken place, nor had business been commenced in good faith by said company under its grant aforesaid before the adoption of the Constitution of 1874."

It is averred in the plea and answer, that since January 1st 1882, the defendant has bought lands adjoining the streams named and is about to erect dams and booms under the said Act or charter of January 7th 1867; that the persons who own large bodies of timber lands lying along said streams above the dams and booms, will not be delayed in floating their logs below the structures, dams and booms about to be erected for a longer period than is necessary to pass through the works of the defendant, and that such reasonable delay and hindrance is indispensable to the enjoyment of the franchises granted by said charter; that the corporators met and accepted said charter on the 25th day of October 1867, and then called in the stock thereof, as appears by the minutes a copy of which is appended; that more than half of the stock of the corporation was subscribed in January 1882, a board of directors chosen by the stockholders on the 21st day of January 1882, and $500, being the bonus on the capital stock, were paid on the 24th day of January 1882, and that the corporators paid the Commonweath the lawful tax, $210, for said charter and lifted it on the 27th day of February 1867, and on April 15th 1867, another statute was passed granting an additional right to the corporation.

Upon the admitted facts, the relator claims that the Act of January 7th 1867, is now of no validity; the defendants claim that it is an executed grant, for private purposes, to the corporators, and is a contract within the protection of the constitution

[Chincleclamouche Lumber and Boom Company *v.* The Commonwealth.]

of the United States, which prohibits a state from passing a law impairing the obligation of contracts.

A grant of a corporate franchise by an Act of legislation, accepted by the grantee, is a contract between the state and the grantee, the obligation of which a subsequent legislature cannot impair. This is settled by numerous decisions of the courts of this state and of the United States. Where it is expressed in the Act itself, or in a general statute in force at the time of the grant, or in the organic law of the state, that the legislature shall have the power to alter, revoke or annul the charter of incorporation, but in such manner that no injustice shall be done to the corporators, such provision is a condition of the grant, or one of the terms of the contract.

It has been said, " that the objects for which a corporation is created are universally such as the government wishes to promote. They are deemed beneficial to the country, and this benefit constitutes the consideration, and in most cases the sole consideration for the grant." The legislature says to citizens, " If you will embark, with your time, money and skill, in an enterprise which will accommodate public necessities, we will grant to you for a limited period, or in perpetuity, privileges that will justify the expenditure of your money, and the employment of your time and skill. Such a grant is a contract with mutual considerations." The Binghamton Bridge, 3 Wall. 51. There is an implied contract on the part of the grantees, that they will perform the duties and exercise the authorities conferred by the charter. Where no time is stipulated, the grantees should perform on their part within a reasonable time, else the object of the grant, the benefit to the public, fails.

While it is manifest that the exercise of the franchises contained in this charter would injure many owners of timber lands and be of little advantage to anybody, except the corporators, yet the bonus on the stock and the payment of taxes were public considerations, besides the supposable benefits to citizens who desired to have their lumber secured and rafted in the booms, on the terms of the statute. The grant was not altogether an executed gift, there was executory consideration. The statute or charter could not be enrolled or have the force of law until the tax of $210 was paid. It could have no effect prior to the payment of the enrollment tax: Act of 1845, P. L. 532. From October 25th 1867, till January 21st 1882, the corporators did nothing. For fifteen years there was no organization, either bona fide or mala fide ; no stockholders, no directors, and the charter named no persons to act as directors and officers previous to an election. In strictness the corporation did no act whatever ; the corporators paid the enrollment tax to give the statute effect, and acquired the charter. There was a com-

[Chincleclamouche Lumber and Boom Company *v.* Commonwealth.]

plete failure to exercise any corporate power—an absolute non-user of the franchises. Such non-user was equivalent to a surrender. What is a reasonable time within which the corporators should begin the performance of their duties under the charter depends much upon the particular circumstances, but it is clear that in a case like this it could not be fifteen years, or even five. "A private corporation created by the legislature may lose its franchises by a mis-user or a non-user of them ; and they may be resumed by the government under a judicial judgment, upon a quo warranto to ascertain and enforce the forfeiture. This is the common law of the land, and is a tacit condition annexed to the creation of every such corporation." Terrett *v.* Taylor, 9 Cranch 43 (Per STORY, J.) ; Mumma *v.* The Potomac Co., 8 Peters 287.

This corporation was organized within the present year, after its franchises had been lost by non-user, though not so declared by judicial judgment. In January 1874, the constitution took effect, and article 16, section 1, declares that " All existing charters or grants of special or exclusive privileges, under which a bonâ fide organization shall not have taken place, and business been commenced in good faith at the time of the adoption of this constitution, shall thereafter have no validity." The purpose of the schedule was to prevent inconvenience arising from changes in the constitution, not to nullify any of its provisions. It cannot be justly said that because the second section of the schedule continues in force all laws not inconsistent with the constitution, that all private laws which are declared of no validity are also in force. That section saves rights and contracts, not charters and grants of special or exclusive privileges. If any charter is a valid, subsisting contract, it is because it is not included in the terms of the first section of the sixteenth article.

The charter of January 7th 1867, was granted by the commonwealth, with right in the legislature to alter, revoke or annul it whenever in their opinion it may be injurious to the citizens. It is to no purpose to discuss the power of a constitutional convention, for the constitution is the law adopted by the people themselves. A revocation of a charter by them ought to have like effect as if by their representatives. The defendants claim under a contract with the state. They show payment of the tax or price for its enrollment, and that no part of its consideration was paid or performed for nearly seven years, when the state revoked it. They waited eight years longer without complaint or action. They had invested nothing, and there is no pretense that the revocation was unjust to the corporators, unless they had the right to perpetually hold the charter without performing any of its express and implied duties. They had no such right. A charter under which no corporate action has ever

[Pentz *v.* Clark.]

been taken, after a reasonable time has elasped, can be avoided by the state at common law. A change of remedy which is not prejudicial to the rights of either party to a contract, does not impair it. Where the corporators have entirely failed to exercise any corporate power within the time named in the charter, or if none be named, within a reasonable time, it is immaterial to them whether the forfeiture be declared by a quo warranto or proceeding in the nature thereof, or by legislation. In either case the result follows the legal non-user. Then, the commonwealth may, by legislative or constitutional enactment, annul and avoid all charters or grants of special or exclusive privileges, under which an organization shall not have taken place, and business been commenced. The constitutional revocation, which took effect in January 1874, applies to no charter which had become a contract and under which a corporation had legal existence; but it repealed all statutes granting special or exclusive privileges, which, at that date, were subject to revocation or appeal.

The charter under which the corporation is claimed to have legal existence, was invalid and had been so declared, before the corporators organized and commenced business.

Judgment affirmed.